1  Patrick J. McGroder III  (No. 002598)
2  Lincoln Combs  (No. 025080)
   GALLAGHER & KENNEDY, P.A.
3  2575 East Camelback Road
   Phoenix, Arizona 85016-9225
4  Telephone:   (602) 530-8000
5  Facsimile:   (602) 530-8500
   Email:        pjm@gknet.com
6                lincoln.combs@gknet.com
7  Attorneys for Plaintiffs Kent Terry and Josephine Terry

8                UNITED STATES DISTRICT COURT
9                    DISTRICT OF ARIZONA

10 Kent Terry, Sr., and Josephine Terry, in          Case No. _____
   their individual capacities as the parents of
11 Brian A. Terry, deceased, and as pending
12 applicants to be co-Personal                       **COMPLAINT**
   Representatives of the Estate of Brian A.
13 Terry; and Julie Epperson, in her official         (*Bivens* Substantive Due Process Claims
   capacity as the Personal Representative of         Under Fifth and First Amendments to
14 the Estate of Brian A. Terry,                       United States Constitution; Negligence;
15                                                     Wrongful Death)
                        Plaintiffs,
16
17 v.                                                  **(Jury Trial Demanded)**
18 William Newell and Jane Doe Newell, a
   married couple; George Gillett and Jane
19 Doe Gillett, a married couple; David Voth
20 and Jane Doe Voth, a married couple; Hope
   MacAllister and John Doe MacAllister,
21 a married couple; Tonya English and John
   Doe English, a married couple; William
22 McMahon and Jane Doe McMahon, a
   married couple; Emory Hurley and Jane
23 Doe Hurley, a married couple; Lone Wolf
24 Trading Company, L.L.C., an Arizona
   limited liability company; and Andre L.
25 Howard and Jane Doe Howard, a married
26 couple,
27                     Defendants.
28

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

Plaintiffs, for their Complaint against Defendants, hereby allege as follows:

## INTRODUCTION

1.      This is an action arising out of the December 15, 2010, wrongful death of Brian Terry.

2.      Defendants created, organized, implemented, and/or participated in a plan – code named "Operation Fast and Furious" – to facilitate the distribution of dangerous firearms to violent criminals.

3.      Defendants William Newell, George Gillett, David Voth, Hope MacAllister, Tonya English, and William McMahon, agents and officers with the United States Department of Alcohol, Tobacco, Firearms and Explosives (the "ATF Defendants," collectively), in conjunction with and with the approval of Defendant Emory Hurley, an attorney with the United States Department of Justice, conceived Operation Fast and Furious and throughout the conduct of that operation acted to ensure that dangerous firearms were distributed to the Mexican drug cartels, the most violent criminal organizations in North America.

4.      Defendants Lone Wolf Trading Company, Inc. and Andre Howard ("Lone Wolf," collectively) knowingly and willingly made illegal sales of dangerous firearms to known "straw purchasers" for the Mexican drug cartels from which a substantial profit was generated.

5.      The ATF Defendants and Defendant Hurley created, organized, implemented, supervised, and participated in Operation Fast and Furious despite the foreseeable certainty that the Mexican drug cartels who Defendant Lone Wolf sold firearms to and who the ATF Defendants and Defendant Hurley intended to receive the firearms would then use those weapons to cause injury and death to members of the public, including and especially other law enforcement officers like Brian Terry.

6.      Defendants imparted no information regarding these illegal firearms sales and transfers to other law enforcement agents or officials, including United States Border

Patrol agents like Brian Terry, whose mission was to engage the outlaws who would be receiving and did receive these weapons.

7.     Firearms that Defendants facilitated delivering to the Mexican drug cartels were used by Mexican drug cartel operatives to murder Brian Terry on December 15, 2010.

8.     Plaintiffs are the parents of Brian Terry, whose application for appointment as the co-Personal Representatives of the Estate of Brian A. Terry is pending, and the current Personal Representative of the Estate of Brian A. Terry.

9.     Plaintiffs, on behalf of the Estate of Brian A, Terry, bring claims against the ATF Defendants and Defendant Hurley pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971), for violating Brian Terry's constitutional substantive due process right to bodily integrity by recklessly and indifferently creating a risk of harm to law enforcement officers like Brian Terry and which did in fact cause harm and death to Brian Terry.

10.     Plaintiffs Kent Terry, Sr. and Josephine Terry also, in their individual capacities as the parents of Brian Terry, bring *Bivens* constitutional claims against the ATF Defendants and Defendant Hurley for the deprivation of Plaintiffs' own constitutional rights to the continuation of their relationship and association with their son caused by those Defendants' conduct.

11.     Plaintiffs Kent Terry, Sr. and Josephine Terry also, in their individual capacities as the parents of Brian Terry, bring claims for negligence and wrongful death under Arizona law against Defendant Lone Wolf for its wrongful conduct causing the death of Brian Terry.

12.     The ATF Defendants and Defendant Hurley knew or should have known that their actions would cause substantial injuries, significant harm, and even death to Mexican and American civilians and law enforcement, but were recklessly indifferent to the consequences of their actions.

13.    Drug cartel violence in Mexico did in fact dramatically increase due to the ATF Defendants' and Defendant Hurley's conduct, and the ATF Defendants and Defendant Hurley received notice of incidents in which Operation Fast and Furious firearms were used against law enforcement officers.  But, despite knowledge of this harm and notice of future harm, the ATF Defendants and Defendant Hurley continued to callously and recklessly disregard the danger of further acts of violence against innocent civilians and law enforcement officers that they had created and did nothing to either stop the flow of weapons to the cartels or warn law enforcement officers like Brian Terry of the amplified danger created by the ATF Defendants' and Defendant Hurley's conduct.

14.    As such, the ATF Defendants and Defendant Hurley are also liable to Plaintiffs for punitive damages under Arizona and federal law.

**PARTIES, JURISDICTION AND VENUE**

15.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

16.    Brian Terry was murdered in the desert west of Rio Rico in Santa Cruz County, Arizona, on or about December 15, 2010.

17.    Before his murder, Brian Terry was a resident of Cochise County, Arizona.

18.    Plaintiff Kent Terry is the surviving natural father of Brian Terry.  Kent is and was at all relevant times a resident of Michigan.

19.    Plaintiff Josephine Terry is the surviving natural mother of Brian Terry. Josephine is and was at all relevant times a resident of Michigan.

20.    Plaintiffs Kent Terry, Sr. and Josephine Terry are Brian Terry's wrongful death statutory beneficiaries pursuant to Arizona law, and bring constitutional claims against the ATF Defendants and Defendant Hurley under *Bivens* for the violation of their constitutional substantive due process right to a continuing relationship with their son.

21.    Plaintiffs Kent Terry, Sr. and Josephine Terry are also the pending successor co-Personal Representatives of the Estate of Brian A. Terry.

22.     Julie Epperson is a Plaintiff solely in her official capacity as the personal representative of the Estate of Brian A. Terry.

23.     Plaintiffs, the current and pending successor Personal Representatives of the Estate of Brian A. Terry, bring constitutional substantive due process claims against the ATF Defendants and Defendant Hurley under *Bivens* in their representative capacity on behalf of the Estate for the violation of Brian Terry's constitutional right to be free from danger and harm caused by the ATF Defendants' and Defendant Hurley's actions.

24.     Defendant William Newell was, at all material times hereto, the Special Agent-in-Charge of the Phoenix office of ATF.

25.     Upon information and belief, Defendant William Newell was at all times material hereto a resident of Maricopa County, Arizona.

26.     Defendant Jane Doe Newell is, upon information and belief, Mr. Newell's wife.  Upon information and belief, Jane Doe Newell was at all times material hereto a resident of Maricopa County, Arizona.  Jane Doe Newell is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when Jane Doe Newell's true name becomes known.

27.     Defendant George Gillett was, from 2008 through June 2010, the Assistant Special Agent-in-Charge of the Phoenix office of ATF with supervisory responsibilities for Gun Trafficking Group VII in the Phoenix office of ATF.

28.     Upon information and belief, Defendant George Gillett was at all times material hereto a resident of Maricopa County, Arizona.

29.     Defendant Jane Doe Gillett is, upon information and belief, Mr. Gillett's wife.  Upon information and belief, Jane Doe Gillett was at all times material hereto a resident of Maricopa County, Arizona.  Jane Doe Gillett is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when Jane Doe Gillett's true name becomes known.

30.     Defendant David Voth was, at all material times hereto, an ATF Special Agent and the Group Supervisor of Gun Trafficking Group VII in the Phoenix office of ATF.

31.     Upon information and belief, Defendant David Voth was at all times material hereto a resident of Maricopa County, Arizona.

32.     Defendant Jane Doe Voth is, upon information and belief, Mr. Voth's wife. Upon information and belief, Jane Doe Voth was at all times material hereto a resident of Maricopa County, Arizona.  Jane Doe Voth is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when Jane Doe Voth's true name becomes known.

33.     Defendant Hope MacAllister was, at all material times hereto, an ATF Special Agent in the Phoenix office of ATF who was the Case Agent for Operation Fast and Furious, an ATF operation ran out of the Phoenix ATF office.

34.     Upon information and belief, Defendant Hope MacAllister was at all times material hereto a resident of Maricopa County, Arizona.

35.     Defendant John Doe MacAllister is, upon information and belief, Ms. MacAllister's husband.  Upon information and belief, John Doe MacAllister was at all times material hereto a resident of Maricopa County, Arizona.  John Doe MacAllister is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs. Plaintiffs will amend this complaint when John Doe MacAllister's true name becomes known.

36.     Defendant Tonya English was, at all material times hereto, an ATF Special Agent in the Phoenix office of ATF who was the Co-Case Agent for Operation Fast and Furious, an ATF operation ran out of the Phoenix ATF office.

37.     Upon information and belief, Defendant Tonya English was at all times material hereto a resident of Maricopa County, Arizona.

38.     Defendant John Doe English is, upon information and belief, Ms. English's husband.  Upon information and belief, John Doe English was at all times material hereto

a resident of Maricopa County, Arizona.  John Doe English is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when John Doe English's true name becomes known.

39.    Defendant William McMahon was, at all material times hereto, an Assistant Deputy Director of ATF with direct supervisory responsibilities for Defendant William Newell.

40.    Upon information and belief, Defendant William McMahon was at all times material hereto a resident of Washington, D.C.

41.    Defendant Jane Doe McMahon is, upon information and belief, Mr. McMahon's wife.  Upon information and belief, Jane Doe McMahon was at all times material hereto a resident of Washington, D.C.  Jane Doe McMahon is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when Jane Doe McMahon's true name becomes known.

42.    Upon information and belief, other U.S. Department of Alcohol, Tobacco, Firearms and Explosives Agents and Administrators may be liable to Plaintiffs as described herein.  Because of these unnamed parties' and the named ATF Defendants' and DOJ Hurley's actions to cover up their wrongdoing and hide their misconduct from Plaintiffs, Congressional investigators, and the general public, the true names and specific relationship to the allegations and Plaintiffs' harm set forth in this Complaint of these unnamed defendants are unknown to Plaintiffs at this time.  Upon discovery of that information, Plaintiffs will ask leave of the Court to amend this Complaint to specify the other ATF Agents and Administrators in addition to the named ATF Defendants against whom Plaintiffs bring claims, to show their true names, and to describe their relationship to the events at issue in this Complaint, as if the same had been asserted herein at this time.

43.    The ATF Defendants were, at all material times hereto, acting in the course and scope of their employment with ATF and under color of federal law.

44.     Defendant Emory Hurley was, at all material times hereto, an Assistant United States Attorney in the District of Arizona and the lead prosecutor assigned to Operation Fast and Furious.

45.     Upon information and belief, Defendant Emory Hurley was at all times material hereto a resident of Maricopa County, Arizona.

46.     Defendant Jane Doe Hurley is, upon information and belief, Mr. Hurley's wife.  Upon information and belief, Jane Doe Hurley was at all times material hereto a resident of Maricopa County, Arizona.  Jane Doe Hurley is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs.  Plaintiffs will amend this complaint when Jane Doe Hurley's true name becomes known.

47.     Upon information and belief, other U.S. Department of Justice Attorneys and Administrators may be liable to Plaintiffs as described herein.  Because of their, the ATF Defendants', and Defendant Hurley's actions to cover up their wrongdoing and hide their misconduct from Plaintiffs, Congressional investigators, and the general public, the true names and specific relationship to the allegations and Plaintiffs' harm set forth in this Complaint of these unnamed defendants are unknown to Plaintiffs at this time.  Upon discovery of that information, Plaintiffs will ask leave of the Court to amend this Complaint to specify the other DOJ Attorneys and Administrators in addition to Defendant Hurley against whom Plaintiffs bring claims, to show their true names, and to describe their relationship to the events at issue in this Complaint, as if the same had been asserted herein at this time.

48.     Defendant Hurley was, at all times relevant hereto, acting in the course and scope of his employment with the Department of Justice and under color of federal law.

49.     The ATF Defendants and Defendant Hurley are sued in their individual capacities.

50.     Defendant Lone Wolf Trading Company, L.L.C. is, and was at all times material hereto, an Arizona limited liability company authorized to do and doing business in Maricopa County, Arizona at 5140 West Peoria Avenue, Suite 110, Glendale, Arizona,

85302. At all relevant times, it acted through its members, agents, and employees including, but not limited to, Defendant Andre L. Howard.

51. Defendant Lone Wolf Trading Company, L.L.C. is engaged in the business of selling firearms and is a Federal Firearms Licensee ("FFL").

52. Defendant Andre L. Howard is, and was at all times material hereto, the owner and principal of Defendant Lone Wolf Trading Company, L.L.C.

53. Upon information and belief, Defendant Andre L. Howard is, and was at all times material hereto, a resident of Maricopa County, Arizona.

54. Upon information and belief, Defendant Jane Doe Howard is, and was at all times material hereto, a resident of Maricopa County, Arizona. Jane Doe Howard is a fictitiously-named defendant whose true identity is presently unknown to plaintiffs. Jane Doe Howard is, upon information and belief, Mr. Howard's wife. Plaintiffs will amend this complaint when Jane Doe Howard's true name becomes known.

55. All individual Defendants are husbands and wives and at all times material hereto were acting on behalf of their marital community as well as themselves.

56. At all relevant times, the Defendants, and each of them, were the agents, joint venturers, partners, employees, employers, or representatives of each other and, participating in the acts and omissions hereafter alleged, were acting within the course and scope of their authority as such servants, joint venturers, partners, employees, employers, or representatives and were acting with the permission and consent of the other Defendants.

57. The claims against the ATF Defendants and Defendant Hurley arise under the Fifth Amendment to the United States Constitution and *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971), which acknowledged a private cause of action for violations of rights afforded under the U.S. Constitution.

58. As such, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

59.     The Court has supplemental jurisdiction over the claims brought under Arizona law under 28 U.S.C. § 1367.

60.     Defendants caused events to occur in the State and District of Arizona out of which the causes of action set forth herein arise, and the Estate of Brian A. Terry suffered harm in the State and District of Arizona.

61.     Venue of this matter in this Court is thus proper pursuant to 28 U.S.C. § 1391(b) and (e).

## FACTUAL BACKGROUND

### Overview of Operation Fast and Furious and Its Gunwalking Tactics

62.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

63.     In 2009, the ATF Defendants and Defendant Hurley created, organized, and implemented an ATF operation code-named "Fast and Furious."

64.     ATF policy is to seize or otherwise interdict all illegally-purchased weapons.

65.     But with Operation Fast and Furious, the ATF Defendants and Defendant Hurley – ATF supervisors and agents in the Phoenix, Arizona ATF office and an Assistant U.S. Attorney for the District of Arizona – intentionally crafted a strategy based on allowing illegal purchases of firearms and subsequent transfers of those illegally-purchased firearms to violent criminals to occur.

66.     This tactic – allowing illegal purchases of firearms to occur and allowing illegally-purchased firearms to transfer into the hands of violent criminals without making any effort to stop the transfers – is known as "gunwalking."

67.     It is well-known and understood in ATF and law enforcement generally that while illegal narcotics or stolen property may occasionally be allowed to "walk" to serve a larger investigatory or prosecutorial purpose, because of the inherent risk to public safety and other law enforcement officers from allowing deadly firearms to move

into the hands of criminals, guns are never allowed to "walk" without every possible effort being made to intercept or otherwise take control of the firearms.

68.     Operation Fast and Furious directly contradicted ATF policy as well as this well-established general law enforcement principle.

69.     Illegal "straw" purchasers of firearms investigated and surveilled by ATF agents as part of Operation Fast and Furious illegally purchased and transferred to the Mexican drug cartels approximately 2000 weapons between October 2009 and October 2010.

70.     All of these firearms transfers were allowed to take place without arrest or interference by ATF or any other law enforcement group because of the actions and omissions of the ATF Defendants or Defendant Hurley.

71.     The ATF Defendants and Defendant Hurley not only failed to take any action to arrest the purchasers, intercept the weapons, or otherwise stop the purchases and transfers from occurring, they took affirmative actions to ensure that the illegal weapons purchases and transfers of those weapons to Mexican drug cartel operatives were allowed to continue.  These affirmative actions included – but were not limited to – encouraging and directing Defendant Lone Wolf and other FFLs to make illegal sales despite concerns about those purchases, falsely telling FFLs and other law enforcement and prosecutorial personnel that the ATF Defendants and Defendant Hurley were tracking and intercepting illegally purchased weapons, and affirmatively instructing ATF agents under their command not to arrest or approach straw purchasers or transferees of the illegally-purchased weapons.

72.     The ATF Defendants and Defendant Hurley were well aware that both ATF policy and fundamental law enforcement principles prohibit gunwalking, and those Defendants also knew that allowing the firearms to walk to the Mexican drug cartels would cause the illegally-acquired firearms to be used by the cartels to murder and harm innocent civilians and other law enforcement officers in the United States and Mexico.

73.     Upon information and belief, the ATF Defendants and Defendant Hurley were aware that law enforcement personnel like Brian Terry were particularly at risk of harm from gunwalking because Border Patrol agents such as Brian Terry were specifically charged with preventing drug trafficking and protecting the public safety in the border region.

74.     The ATF Defendants and Defendant Hurley were recklessly indifferent to the certainty of violence and mayhem their actions caused, were causing, and would cause in the future and persisted in ordering agents to engage in gunwalking for over fifteen months from the inception of Operation Fast and Furious in October 2009 to Brian Terry's murder on December 15, 2010.

75.     The ATF agents involved in Operation Fast and Furious under the ATF Defendants' control and supervision repeatedly expressed to the ATF Defendants their dismay and frustration with the gunwalking tactics and asked the ATF Defendants for permission to arrest the straw purchasers or to at least intercept the weapons before they went to the cartels.

76.     The ATF Defendants repeatedly denied all such requests and insisted that the ATF agents on the street conducting the investigations stand down and allow the firearms to "walk" into the hands of the drug cartels, until Operation Fast and Furious was shut down by the ATF Defendants and Defendant Hurley following the murder of Brian Terry on December 15, 2010.

**Operation Fast and Furious Begins in October 2009**

77.     In October 2009, Defendant Newell formed Group VII in the Phoenix ATF office, and directed Group VII to focus on firearms trafficking investigations.

78.     By the end of October 2009, Group VII had identified a suspected firearms trafficking ring operating in the Phoenix metropolitan area that used straw purchasers without criminal backgrounds as proxies for purchasing large quantities of firearms.

79.     The suspected firearms trafficking conspiracy was believed to be funded by and operating for the benefit of one or more Mexican drug cartels.

80.    The straw purchasers would certify that the purchased weapons were for their own personal use for the purpose of passing the background check required for the firearms purchase, then immediately transfer the weapons to operatives with the Mexican drug cartels for use in acts of criminal violence in the United States and Mexico.

81.    Falsely certifying that a firearm is being purchased for the purchaser's own use is a federal crime.

82.    All of the straw purchasers investigated during Operation Fast and Furious were eventually arrested and charged with this offense following the death of Brian Terry on December 15, 2010.

83.    At Defendant Newell's, Defendant Gillett's, Defendant Voth's, and Defendant MacAllister's direction, Group VII ATF agents involved in Fast and Furious were to investigate and surveil illegal straw purchasers of firearms but, with the agreement of Defendant Hurley, were expressly instructed to refrain from arresting the straw purchasers, interdicting the weapons, or otherwise doing anything to stop the illegally-purchased weapons from being transferred to the Mexican drug cartels.

84.    By the end of November 2009, five to six straw purchasers had been identified as part of the conspiracy, and those purchasers had already spent nearly $200,000 to purchase 341 weapons.

85.    Two safe houses had also been identified where the trafficking ring and straw purchasers were storing the weapons for transfer to the cartels.

86.    Weapons had already by November 2009 been found at crime scenes in Mexico that could be traced by serial number back to illegal purchases by the firearms trafficking ring under investigation in Operation Fast and Furious.

87.    Both the ATF Defendants and Defendant Hurley were aware that illegally-purchased weapons were being used by the Mexican drug cartels to commit violent crimes by November 2009.

13

88.     Both the ATF Defendants and Defendant Hurley were aware that law enforcement officers in the border region like Brian Terry were at particular risk of cartel-related violence.

89.     On November 24, 2009, Jaime Avila made his first straw purchase for the firearms trafficking conspiracy, buying two weapons from Defendant Lone Wolf while in the company of two other straw purchasers.

90.     In December 2009, the firearms purchases by the trafficking conspiracy group increased in frequency and quantity.

91.     There was substantial evidence that these purchases were illegal, including the large amounts of weapons purchased in a short time period by the same straw purchasers, the large amounts of cash used in these purchases, and the very short time frame – as little as 24 hours – before weapons purchases by the straw purchasers would show up at crime scenes in the United States and Mexico.

92.     In December 2009, ATF agents under the supervision of the ATF Defendants witnessed straw purchasers transferring weapons to suspected Mexican drug cartel operatives immediately following purchases from Defendant Lone Wolf and other FFLs.

93.     Despite this evidence of illegal activity and harm caused to innocent civilians from permitting these weapons to flow into the hands of the Mexican drug cartels, the ATF Defendants and Defendant Hurley continued to take no action to intercept the illegally-purchased firearms or arrest anyone involved in the firearms trafficking conspiracy.

94.     Other federal law enforcement agencies were also investigating members of the firearms trafficking conspiracy, but rather than using the evidence those other agencies had obtained to stop the illegal weapons purchases and transfers, the ATF Defendants and Defendant Hurley acted to hinder other agencies' efforts to stop the conspiracy so that the ATF Defendants and Defendant Hurley could gather more evidence.

95.     The ATF Defendants and Defendant Hurley wanted to build a "big" case to "take down the cartel" and so discouraged both their own ATF agents and other law enforcement agencies from doing anything to interfere with the firearms trafficking conspiracy until the ATF Defendants and Defendant Hurley could obtain a wiretap which they believed would lead to arrests of suspects of higher rank in the cartels.

96.     Through the rest of 2009 into 2010 the ATF Defendants and Defendant Hurley acted to ensure that the straw purchases and transfer of weapons to the cartels were allowed to continue.

## Defendant Voth, Defendant MacAllister, and Defendant Hurley Meet With Defendant Lone Wolf

97.     Defendant Lone Wolf also had substantial reason to believe that the purchases by the straw buyers were illegal, but continued to make those sales and reap substantial profits from those illegal sales.

98.     The straw purchases were so frequent and so obviously illegal that, upon information and belief, the ATF Defendants and Defendant Hurley arranged for a hidden camera to be installed at Defendant Lone Wolf so that the ATF Defendants and Defendant Hurley could observe straw purchases in real time.

99.     Defendant Lone Wolf expressed concern to ATF regarding the legality of the sales, and requested a meeting with ATF and DOJ officials in December 2009.

100.    On December 17, 2009, Defendant Voth, Defendant MacAllister, and Defendant Hurley met with Defendant Lone Wolf to discuss the ongoing illegal purchases.

101.    In the meeting, upon information and belief, Defendant Voth, Defendant MacAllister, and Defendant Hurley requested Defendant Lone Wolf to continue to make the sales to the straw purchasers despite his concerns and to keep sharing intelligence on those purchases with them.

102.   Upon information and belief, they told Defendant Lone Wolf that his cooperation in making the sales was important to their investigation of the firearms trafficking conspiracy.

103.   Upon information and belief, they told Defendant Lone Wolf that ATF was tracking the weapons and intercepting them before they could be used to harm innocent civilians or law enforcement officers.

104.   Defendant Voth has publicly denied that he or any other ATF Defendant or DOJ Defendant ever instructed Defendant Lone Wolf or any other FFL to make a sale to a suspicious purchaser.

105.   A January 28, 2011, memo from Defendant Hurley to his supervisor, United States Attorney for the District of Arizona Dennis Burke, asserts that Defendant Voth, Defendant MacAllister, and Defendant Hurley advised Defendant Lone Wolf that they could not tell him to make sales and that Defendant Lone Wolf would have to use its own judgment as to whether any sale was lawful.

106.   In the alternative, Plaintiffs allege, upon information and belief, that Defendant Lone Wolf made illegal sales solely of its own volition and without encouragement or direction from Defendant Voth, Defendant MacAllister, Defendant Hurley, or any other unnamed ATF agent or DOJ attorney.

107.   Following this December 17, 2009, conversation with Defendant Voth, Defendant MacAllister, and Defendant Hurley, Defendant Lone Wolf continued to make sales to suspected straw purchasers despite the suspicious circumstances surrounding those purchases and continued to receive profit from these known illegal sales.

**The ATF Defendants and Defendant Hurley Expressly Approve Gunwalking**

108.   By the end of 2009, 19 straw purchasers identified as part of the Operation Fast and Furious investigation had purchased 690 firearms, spending approximately $350,000 over the previous two and a half months.

109.   The vast majority of these purchases were from Defendant Lone Wolf, 619 weapons involving over $335,000.

16

110.   In early January 2010, Defendant MacAllister, Defendant Voth, Defendant Gillett, and Defendant Hurley met to discuss Operation Fast and Furious.

111.   Defendant Voth subsequently drafted a briefing paper summarizing Operation Fast and Furious and its goals.  Upon information and belief, this briefing paper was drafted at the direction of Defendant Newell and was based on the input provided at the meeting by Defendant MacAllister, Defendant Gillett, and Defendant Hurley.

112.   The briefing paper identifies the goal of the investigation as obtaining approval for a federal Title III wiretap of suspects identified as leaders in the firearms trafficking conspiracy.

113.   The briefing paper also expressly describes the use of gunwalking in Operation Fast and Furious: "Currently our strategy is to allow the transfer of firearms to take place . . . ."

114.   Defendant Newell subsequently reviewed and approved the briefing paper and description of gunwalking tactics used in Operation Fast and Furious.

115.   Defendant Newell edited the briefing paper further and passed it along to ATF administrators and supervisors in Washington, D.C., adding "at a much slower pace" to the description of the "allow the transfer to take place" Operation Fast and Furious strategy, even though this additional clause was untrue because the ATF Defendants and Defendant Hurley were doing nothing to stop (and actively discouraging others' efforts to interfere with) the illegal purchases and transfers.

116.   Upon information and belief, Defendant McMahon subsequently viewed the briefing paper forward by Defendant Newell and approved both the briefing paper and the gunwalking tactics used in Operation Fast and Furious as described in the briefing paper.

**Jamie Avila Purchases the Weapons Used in the Murder of Brian Terry**

117.    Jaime Avila was among the suspects who had by December 2009 been confirmed by the Operation Fast and Furious investigation as a straw purchaser for the firearms trafficking conspiracy.

118.    On January 9, 2010, Jaime Avila purchased two more weapons from Defendant Lone Wolf.

119.    These two weapons were recovered on January 14, 2010, by U.S. Border Patrol officers in Columbus, New Mexico during a search of a suspicious vehicle attempting to cross the U.S./Mexico border.

120.    This was only further evidence that Avila was not purchasing weapons for his own use but was in fact a straw purchaser for the Mexican drug cartels, and that cartel operatives were attempting to immediately move the weapons he was illegally purchasing across the border.

121.    Despite this and a wealth of other evidence of Avila's criminal activity, the ATF Defendants and Defendant Hurley continued to direct others not to arrest Avila or interfere with his illegal purchases, and Defendant Lone Wolf continued to make firearms sales to Avila.

122.    On January 16, 2010, Avila bought three more weapons from Defendant Lone Wolf, three WASR-10 AK-47 type assault rifles.

123.    The ATF Defendants and Defendant Hurley were aware of this purchase by at least January 19, 2010, but did nothing to arrest Avila, intercept those weapons, or warn other law enforcement authorities such as U.S. Border Patrol agents like Brian Terry of the imminent danger posed by these weapons and the hundreds of others allowed to be transferred to the Mexican Drug Cartels by the ATF Defendants and Defendant Hurley.

124.    Two of the weapons purchased by Avila from Defendant Lone Wolf on January 16, 2010, were found at the scene and used in the murder of Brian Terry on December 15, 2010.

125.   Had Avila been arrested and the weapons been seized at the time of the January 16, 2010 purchase, Brian Terry would not have been murdered on December 15, 2010.

**Further Affirmative Efforts by the ATF Defendants and Defendant Hurley to Prevent Others From Intercepting Illegal Firearms or Warning Other Law Enforcement Authority of the Dangers Created by Operation Fast and Furious**

126.   Phoenix ATF agents in Group VII did not approve of the gunwalking tactics and were highly critical of the ATF Defendants and Defendant Hurley for their insistence on allowing illegal sales to occur and illegally-purchased weapons to be transferred to the Mexican drug cartels.

127.   Veteran Group VII agents repeatedly asked permission to intercept illegally-purchased weapons and/or arrest straw purchasers but were repeatedly told by Defendant Gillett, Defendant Voth, Defendant English, and Defendant MacAllister that the agents could not interdict any of the weapons, arrest any of the straw purchasers, or even talk to the straw purchasers or others involved in the firearms trafficking conspiracy.

128.   The veteran ATF agents on several occasions warned the ATF Defendants that these tactics were in violation of ATF policy and general law enforcement principles, but the ATF Defendants disregarded these warnings.

129.   In March 2010, Defendant Voth directly addressed the criticism Operation Fast and Furious and its gunwalking tactics were receiving from the veteran ATF agents involved in the operation under the ATF Defendants' control, patronizingly dismissing their concerns as "petty arguing" and "adolescent."

130.   Defendant Voth characterized gunwalking and Operation Fast and Furious as the "pinnacle of domestic U.S. law enforcement techniques" and "the biggest tool in our law enforcement tool box."  He said that ATF agents under his supervision who did not agree with the gunwalking tactics should quit and take jobs at the Maricopa County Jail "serving lunch to inmates all day."

131.   Despite Defendant Voth's tough talk, ATF agents continued to request permission from the ATF Defendants to intercept weapons or arrest the straw purchasers, upon information and belief, to the point of getting in screaming matches with Defendant MacAllister and Defendant English.

132.   But each time, the ATF Defendants denied the requests by the ATF agents to take action, expressly instructing them to stand down.

133.   Besides the veteran ATF agents under the ATF Defendants' supervision, FFLs who the ATF Defendants and Defendant Hurley encouraged and directed to make sales to obviously illegal straw buyers also expressed concern to ATF about those purchases.  The FFLs asked ATF for reassurances that ATF was investigating and surveilling the straw buyers to ensure that weapons were not being transferred to the Mexican drug cartels or other criminal enterprises.

134.   The proprietor of one FFL sent an email to Defendant Voth saying, "I want to help ATF, but not at the risk of agents' safety because I have some very close friends that are U.S. Border Patrol agents in southern AZ."

135.   The ATF Defendants and Defendant Hurley dismissed the FFL's concerns, encouraged the FFLs to make sales to known straw buyers, and falsely assured the FFLs that ATF was actively tracking all of the illegally-purchased weapons so that they could not be used by Mexican drug cartels to commit acts of violence against civilians or law enforcement personnel.

136.   In fact, the ATF Defendants and Defendant Hurley made little or no effort to track the hundreds and ultimately thousands of weapons that they were allowing the straw buyers to purchase and transfer to the cartels in 2009 and 2010.

137.   By March 2010, the effects of Operation Fast and Furious began to be felt on both sides of the border.

138.   That month was the deadliest month in the border area in five years, with over 187 murders in Sinaloa, Mexico alone, including eleven policemen.

139.   Many of the ATF agents involved in Operation Fast and Furious were distraught at the news because the enormous increase in the suffering and violence the Mexican drug cartels were able to inflict was obviously caused by the ATF facilitating the transfer of hundreds and perhaps thousands of assault rifles and other deadly weapons to the cartels.

140.   But the ATF Defendants and Defendant Hurley were actually pleased at the news because it showed that Operation Fast and Furious was "working" in the sense that weapons they had ensured were illegally purchased and transferred to the cartels were definitively being used by the cartels to cause violence and harm.

141.   Defendant Voth repeated the instruction to the Group VII agents under his supervision that no straw purchasers should be arrested and no illegally-purchased weapons should be seized until the ATF Defendants and Defendant Hurley could "dismantle the entire organization."

142.   The ATF Defendants and Defendant Hurley were focused solely on getting a T-III wiretap and the perceived benefits that that achievement would have for their career advancement potential, rather than on stopping violent criminals from illegally obtaining deadly firearms.

143.   The ATF Defendants and Defendant Hurley ultimately obtained a series of T-III wiretap approvals in the spring of 2010, but little useful evidence was gained through use of those wiretaps.

144.   In the first half of 2010 the ATF Defendants and Defendant Hurley repeatedly falsely assured others that they were making progress towards a large investigation of one or more Mexican drug cartels that would, as Defendant Voth put it, "dismantle the entire organization."

145.   But the ATF Defendants and Defendant Hurley were never able to obtain any evidence that could lead to the arrest and prosecution of any cartel operative or anyone else involved in the conspiracy to illegally purchase firearms; no operation to "dismantle" the cartels was forthcoming.

146. The ATF Defendants and Defendant Hurley ignored clear and obvious evidence of the deadly danger that their actions were creating for other law enforcement officers like Brian Terry, as well as innocent civilians in the United States and Mexico.

147. The danger that the ATF Defendants and Defendant Hurley were creating was particularly acute for law enforcement officials charged with protecting the public and preventing crime in the border region, like Brian Terry.

148. In March 2010, two Arizona DPS officers pursued a suspect who turned and fired on them before his vehicle spun out of control and he was arrested. Firearms later traced to Operation Fast and Furious straw purchases were found in the vehicle, and one of those weapons may have been used by the suspect to attempt to murder the officers.

149. In July and August 2010, guns traced to Operation Fast and Furious began being seized from "safe" houses operated by drug dealers in the Phoenix area.

150. Weapons purchased by Operation Fast and Furious straw buyers also turned up at multiple crime scenes in Mexico in 2010, including the scene of the kidnapping, torture, and murder of Mario Gonzalez Rodriguez, the brother of a Mexican prosecutor, by drug cartel operatives in November 2010.

151. Despite the ATF Defendants' and Defendant Hurley's knowledge of these incidents, and despite the certainty that weapons that they had allowed to walk were being used by criminals in the U.S. and Mexico against innocent civilians and law enforcement officers, the ATF Defendants and Defendant Hurley continued to be recklessly indifferent to and uncaring of both the harm already caused by their actions and the harm that their actions would continue to cause on both sides of the border in the future.

152. Upon information and belief, when a veteran ATF agent asked either Defendant English or Defendant MacAllister if she was prepared to go to the funeral of an American law enforcement officer killed by a Fast and Furious weapon, Defendant

1   English or Defendant MacAllister replied, "You have to scramble a few eggs to make an

2   omelette."

3        153.    Comments like these reflect the attitude among the ATF Defendants and

4   Defendant Hurley that – although they knew that their actions were certain to cause death

5   and harm to law enforcement agents like Brian Terry – they didn't care about the bodily

6   harm and constitutional rights violations caused by their actions.

7        154.    The ATF Defendants and Defendant Hurley continued to use gunwalking

8   tactics as part of Operation Fast and Furious throughout 2010 despite quickly losing track

9   of most or all of the illegally-purchased firearms, failing to obtain any intelligence that

10  would enable them to arrest any cartel member or operative other than the straw

11  purchasers, seeing a spike in Mexican drug cartel violence following the implementation

12  of the gunwalking strategy, and knowing that weapons they were causing to walk were

13  being used in criminal activity, including acts of violence and murder in the U.S. and

14  Mexico, and were certain to be used in future acts of violence and murder, including acts

15  of violence and murder against law enforcement officers in the border region like Brian

16  Terry.

17       155.    The ATF Defendants and Defendant Hurley did nothing to mitigate the

18  harm caused by their actions, either to reacquire the weapons they had caused to walk to

19  the Mexican drug cartels or to warn other law enforcement officers in Arizona or

20  elsewhere of the incredible danger that they now faced because of the ATF Defendants'

21  and Defendant Hurley's efforts to arm the cartels with brand new, sophisticated

22  weaponry.

23       156.    The quality and condition of the weapons which the drug cartels were able

24  to obtain because of the ATF Defendants' and Defendant Hurley's actions were more

25  advanced and represented a much greater threat to other law enforcement officers like

26  Brian Terry than the cartels would have otherwise been able to acquire if not for the ATF

27  Defendants' and Defendant Hurley's conduct.

28

157.   All of the firearms illegally purchased by the firearms trafficking conspiracy were "weapons of choice" for the Mexican drug cartels because those types of weapons – military-grade firearms designed solely to kill and maim other human beings, including high-powered pistols, assault rifles, and even .50 caliber sniper and anti-materiel rifles – best serve the Mexican drug cartels' purposes of using the weapons to commit crimes of intimidation, violence, and murder against civilians and law enforcement on both sides of the border.

158.   The criminal indictment of the straw purchasers that ultimately arose out of Operation Fast and Furious expressly acknowledged the link between the illegal firearms purchases and the acts of criminal violence committed against law enforcement offices by the Mexican drug cartels with those weapons, stating, "Drug Trafficking Organizations rely upon the use of firearms to protect their supply of drugs, supply routes, profits, and distribution from . . . law enforcement agents . . . ."

### The Murder of Brian Terry and the ATF Defendants' and Defendant Hurley's Attempts to Cover Up the Link Between the Murder and Operation Fast and Furious

159.   On December 15, 2010, Plaintiffs' son, U.S. Border Patrol Agent Brian Terry, was shot and killed by Mexican drug cartel operatives in the desert near Rio Rico, Arizona, eighteen miles inside the U.S.-Mexico border.

160.   Two AK-47 style firearms were the only weapons recovered from the scene of Brian Terry's murder.

161.   Those two weapons were among those purchased by Avila from Defendant Lone Wolf on January 16, 2010.

162.   Avila had purchased AK-47 style firearms and other guns from Lone Wolf on at least two other occasions in the previous six weeks, purchasing ten weapons in all, before purchasing the weapons used to murder Brian Terry.

163.   On some of these prior occasions, Avila was accompanied by other known straw buyers who were also making other illegal firearms purchases.

164.   The ATF Defendants and Defendant Hurley directly observed or otherwise knew of all of these illegal purchases shortly after they occurred, including Avila's purchase of the Brian Terry murder weapons and his prior illegal weapons purchases for the cartels.

165.   By November 2009, ATF had probable cause to arrest Avila and otherwise scuttle the Mexican drug cartels' conspiracy to use Avila and other straw purchasers to illegally acquire weapons to commit violence against law enforcement officers, but the ATF Defendants and Defendant Hurley directed ATF agents under their control not to arrest Avila or anyone else and to do nothing to stop the cartels from acquiring the weapons.

166.   On March 3, 2010, a pistol that Avila had illegally purchased on March 1, 2010, was found at a drug house in Phoenix.

167.   Once again, despite the certain knowledge that weapons purchased by Avila were being immediately transferred to organized criminals to further acts of violence and murder, the ATF Defendants and Defendant Hurley did nothing to stop guns from walking, refused to allow ATF agents to arrest Avila or intercept the illegally-purchased weapons, did nothing to reacquire the weapons that they had let walk, and did nothing to warn law enforcement officers of the elevated danger caused by Operation Fast and Furious and the ATF Defendants' and Defendant Hurley's express instructions to let guns illegally purchased by Avila and other straw buyers walk into the hands of the cartels, regardless of the harm that they caused.

168.   Within hours of Brian Terry's murder on December 15, 2010, the ATF Defendants and Defendant Hurley were aware that the weapons used in the murder scene had been purchased by Avila while he was under observation and investigation in Operation Fast and Furious.

169.   The ATF Defendants and Defendant Hurley ordered Avila arrested for violating federal firearms laws on December 16, 2010, but expressly decided not to charge him with crimes related to the January 16, 2010, purchase of the weapons used in

the murder of Brian Terry to avoid drawing attention the link between the murder and Operation Fast and Furious.

170.    The ATF Defendants' and Defendant Hurley's decision to immediately arrest Avila after Brian Terry's murder – when they had tracked Avila's illegal activity for over a year without bringing him into custody – and to avoid charging him with buying the weapons used in that murder demonstrates that the ATF Defendants and Defendant Hurley were immediately aware of and attempting to prevent others discovering the role their actions had played in causing Brian Terry's death.

171.    Following Brian Terry's murder, the ATF Defendants and Defendant Hurley engaged in other actions to cover up their wrongdoing and their role in the murder.

172.    These affirmative actions included making misrepresentations to Congressional investigators and members of the media about Operation Fast and Furious, the ATF Defendants' use of gunwalking tactics, and the ATF Defendants' and Defendant Hurley's approval of those tactics.

173.    At the time of Brian Terry's murder or immediately following his murder, the ATF Defendants and Defendant Hurley knew:

- that weapons used in the murder of Brian Terry and recovered at the murder scene had been allowed to "walk" as part of Operation Fast and Furious, specifically that they had been purchased by Jaime Avila from Defendant Lone Wolf on January 16, 2010;
- that those weapons purchased by Jaime Avila on January 16, 2010 and later recovered at the scene of Brian's murder were AK-47 style assault rifles; and
- that ballistics tests showed that the bullet that killed Brian was consistent with a round from an AK-47 style assault rifle.

174.   The ATF Defendants and Defendant Hurley, however, shared none of this information with Congressional investigators, the media, or the general public.  In fact, they actively attempted to keep this information from becoming public.

175.   This attempted cover-up of their wrongdoing by the ATF Defendants and Defendant Hurley exacerbated Plaintiffs' anguish and emotional suffering over the loss of their son, aggravating their damages recoverable in this suit.

176.   The January 25, 2011, press release announcing the indictment and prosecution of Avila and other straw purchasers that was the culmination of Operation Fast and Furious, while failing to acknowledge or mention gunwalking or the ATF Defendants' and Defendant Hurley's role in arming Brian Terry's killers, affirmatively linked Avila and the illegal weapons purchases to Brian Terry's murder, stating that "those individuals that knowingly falsify ATF firearms forms in order to supply Mexican drug cartels with firearms have as much blood on their hands as the criminals that use them."

177.   If the ATF Defendants and Defendant Hurley had acted reasonably and consistently with their duties as ATF officers to uphold the Constitution and comply with ATF policy, they would have allowed ATF agents investigating the straw purchasers to arrest Avila following one of his prior illegal purchases or to otherwise either prevent the illegal purchases from occurring or prevent the illegally-purchased firearms from moving into the hands of the Mexican drug cartels and exposing civilians and law enforcement in the border region to additional danger.

178.   If the ATF Defendants and Defendant Hurley had acted reasonably and consistently with their duties as ATF officers to uphold the Constitution and comply with ATF policy and basic law enforcement principles, Brian Terry would never have been exposed to the additional risk of harm and death danger the ATF Defendants and Defendant Hurley created for him and other similarly-situated law enforcement officers in the border region.

179.   Instead, the ATF Defendants and Defendant Hurley acted to ensure that the illegal firearms purchases occurred, that the straw buyers were allowed to keep making illegal purchases, and that the illegally-purchased firearms ultimately were available for the Mexican drug cartels to commit acts of criminal violence and murder.

180.   The ATF Defendants' and Defendant Hurley's affirmative actions placed Brian Terry in a position of danger to which he otherwise would not have been exposed.

181.   The ATF Defendants' and Defendant Hurley's affirmative actions to misrepresent to other ATF administrators, other DOJ officials, and other law enforcement agents and administrators the existence, nature, and scope of the gunwalking tactics used in and number of illegally-purchased weapons transferred to the Mexican drug cartels during Operation Fast and Furious, both before and after Jaime Avila illegally purchased the weapons used in the murder of Brian Terry, prevented other federal law enforcement officials from intervening to bring Operation Fast and Furious to a halt before the danger Operation Fast and Furious posed to law enforcement officers, particularly law enforcement officers working in the border area like Brian Terry, could manifest and cause injury and death.

182.   The ATF Defendants' and Defendant Hurley's affirmative actions to misrepresent the gunwalking tactics used in Operation Fast and Furious also prevented other law enforcement authority from publicizing the danger Operation Fast and Furious created, particularly law enforcement officers working in the border area like Brian Terry.

183.   This deception prevented law enforcement officers working in the border area, including U.S. Border Patrol BORTAC special operations officers like Brian Terry, from using that intelligence to better prepare for armed confrontations with Mexican drug cartel operatives in the border area.

184.   If Brian Terry's BORTAC team had had knowledge of the gunwalking tactics and massive amounts of deadly firearms allowed to be transferred to the Mexican drug cartels in Operation Fast and Furious they would have used different tactics and

different weaponry in the confrontation with cartel operatives in which Brian Terry was killed, and those different tactics would have substantially diminished or eliminated the chance that Brian would have been shot or killed in that confrontation.

185.    The ATF Defendants' and Defendant Hurley's actions caused Brian Terry to be murdered by illegally-armed Mexican drug cartel operatives on December 15, 2010.

186.    The risks to Brian Terry and similarly-situated law enforcement personnel in the border region from the actions of Defendants described herein were reasonably foreseeable and in fact known and understood by all Defendants.

## CLAIM ONE
### Defendant William Newell
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's Constitutional Right to Be Free of Bodily Harm)

187.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

188.    This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant Newell for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

189.    The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

190.    Defendant Newell violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

191.    The additional danger created by Defendant Newell was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

192.   In addition to the conduct already described herein, Defendant Newell himself specifically created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Creating, organizing, implementing, and supervising Operation Fast and Furious, an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms;

- Directing Operation Fast and Furious to eschew proper law enforcement strategies to arrest straw purchasers and intercept illegally-purchased weapons in order to solely focus on obtaining a T-III federal wiretap because obtaining such a wiretap would better promote Defendant Newell's professional and political career;

- Despite knowing by November 2009 that weapons bought by straw purchasers under investigation in Operation Fast and Furious were going immediately across the border to the Mexican drug cartels for use in violent crimes, and knowing that allowing these purchases and transfers to continue was wrongful, continuing in November 2009, December 2009, and through 2010 to order ATF agents not to intercept the weapons or even approach the straw purchasers;

- On November 25, 2009, instructing other federal law enforcement authority to "stand down" and not contact straw purchasers so as not to "compromise" Operation Fast and Furious;

- On January 5, 2010, falsely informing superiors in ATF that he and the other ATF Defendants and Defendant Hurley were doing everything in their power to slow down the straw purchasers, so as to prevent other ATF administrators from intervening to stop the illegal purchase of firearms, including the January 16, 2010, illegal purchase of the firearms used in the murder of Brian Terry by Jaime Avila.

- Continuing to deceive superiors in ATF that Operation Fast and Furious was tracking all of the illegally-purchased weapons throughout 2010; and
- Aggravating Plaintiffs' harm by engaging in a cover-up of Operation Fast and Furious following the death of Brian Terry, including

    i.    approving the plan to arrest Avila immediately following the Brian Terry murder for unrelated crimes to hide the link between Avila, Operation Fast and Furious, and the murder;

    ii.    instituting a gag order on discussion of Operation Fast and Furious outside of Group VII;

    iii.    falsely denying gunwalking accusations at the January 19, 2011, press conference to announce the prosecution of Avila and the other Operation Fast and Furious straw purchasers; and

    iv.    falsely responding to a congressional inquiry on January 27, 2011, that he and the other ATF Defendants and Defendant Hurley were not aware of Avila's role in the firearms trafficking conspiracy at the time he bought the weapons used in the murder of Brian Terry.

193.   In internal emails to other federal law enforcement and prosecutorial personnel, including other ATF Defendants, Defendant Newell acknowledged the recklessness of the gunwalking tactics in Operation Fast and Furious and the falsity of his statements to others about the surveillance and tracking of the illegally purchased weapons.

194.   The additional danger created by Defendant Newell caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Newell's actions described herein.

195.   Brian Terry's death was a foreseeable consequence of Defendant Newell's affirmative actions described herein.

196.   Defendant Newell was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but

1  Defendant Newell was recklessly indifferent to the consequences of the danger he had
2  created.

3      197.   Defendant Newell was further aware that federal law enforcement agents
4  working in and around the United States-Mexico border area, like U.S. Border Patrol
5  agent Brian Terry, were particularly likely to suffer physical harm or death as a result of
6  Operation Fast and Furious and Defendant Newell's actions.

7      198.   Defendant Newell is not entitled to qualified immunity.

8      199.   As explained herein, Defendant Newell violated Brian Terry's
9  constitutional liberty interest in bodily security by knowingly creating an additional
10  danger to law enforcement officers like Brian Terry.

11      200.   Brian Terry's constitutional right to be free from state-created danger was
12  clearly established by the time of Defendant Newell's actions in 2009 and 2010.

13      201.   By 2009 it was clearly established beyond dispute that federal officials
14  could be held liable for constitutional violations where they affirmatively and with
15  deliberate indifference placed an individual in danger he would not otherwise have faced.

16      202.   No reasonable federal law enforcement officer in Defendant Newell's
17  position could have concluded that Brian Terry had no constitutional right not to be
18  placed in physical danger by Defendant Newell's deliberately indifferent actions.

19      203.   Moreover, Defendant Newell took no action to warn Brian Terry and
20  similarly-situated law enforcement officers of the danger Defendant Newell's actions
21  created even after other acts of criminal violence using the illegally-purchased firearms
22  against other American law enforcement agents occurred, so Brian Terry and similarly-
23  situated law enforcement officers working near the United States-Mexico border had no
24  opportunity to take protective measures to address or avoid the danger.

25      204.   Defendant Newell's actions depriving Brian Terry of his constitutionally-
26  protected liberty interest in bodily integrity proximately and actually caused him harm.

27      205.   The amount of damages to compensate Brian Terry's decedent estate for
28  the harm caused by Defendants' actions will be proved at trial.

206.   Defendant Newell's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

207.   Defendant Newell's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Newell, in an amount to be determined at trial.

## CLAIM TWO
### Defendant William Newell

(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

208.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

209.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant Newell for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

210.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

211.   Defendant Newell violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

212.   The additional danger created by Defendant Newell was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

213.   The additional danger created by Defendant Newell caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was

murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Newell's actions.

214.   Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant Newell's affirmative actions described herein.

215.   Defendant Newell was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but was recklessly indifferent to the consequences of the danger he had created, as set forth herein.

216.   Defendant Newell is not entitled to qualified immunity.

217.   As explained herein, Defendant Newell violated Plaintiffs' constitutional liberty interest in a continuing relationship with their son by knowingly creating an additional danger to law enforcement officers like Brian Terry.

218.   Plaintiffs had a constitutional right to be free from state-created danger that could cause the loss of their son, and this constitutional right was clearly established by the time of Defendants' actions in 2009 and 2010.

219.   By 2009 it was clearly established beyond dispute that federal officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

220.   No reasonable federal law enforcement officer in Defendant Newell's position could have concluded that Plaintiffs had no constitutional right for their son not to be placed in physical danger by Defendant Newell's deliberately indifferent actions.

221.   Defendant Newell's actions proximately and actually caused the death of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their constitutionally-protected liberty interest in familial companionship.

222.   The amount of damages to compensate Plaintiffs for the harm caused by Defendant Newell's actions depriving them of their constitutionally-protected liberty interest in familial companionship will be proved at trial.

223.    Defendant Newell's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

224.    Defendant Newell's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Newell, in an amount to be determined at trial.

## CLAIM THREE
### Defendant George Gillett
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's Constitutional Right to Be Free of Bodily Harm)

225.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

226.    This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant Gillett for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

227.    The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

228.    Defendant Gillett violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

229.    The additional danger created by Defendant Gillett was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

230.    In addition to the conduct already described herein, Defendant Gillett himself specifically created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Creating, organizing, implementing, and supervising Operation Fast and Furious, an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms;
- Improperly relying on an October 2009 DOJ strategy memo as a justification for approving gunwalking tactics in Operation Fast and Furious;
- Refusing a December 8, 2009, request from ATF's Tucson office to take action to slow or stop the large amounts of illegal weapons purchases and transfers by Mexican drug cartel operatives and instructing Defendant Voth to keep the request "between us";
- Falsely telling other ATF officials on December 17, 2009, that Group VII was acting to slow or stop the illegal straw purchases;
- Falsely relying on a 1989 ATF policy memo for support of gunwalking tactics, and forwarding that memo to Defendant Voth in December 2009;
- Approving a January 5, 2010, briefing paper on Operation Fast and Furious by Defendant Voth which expressly stated that the current strategy was "to allow the transfer of firearms"; and
- Falsely informing other federal law enforcement authorities in January 2010 that Operation Fast and Furious investigators never had an opportunity to seize illegally-purchased weapons.

231.   Defendant Gillett acknowledged his awareness of the risk to law enforcement officers working in the Mexico-U.S. border region created by his actions, indicating in a conversation with Group VII agents that he believed that the benefits of the Operation Fast and Furious investigation outweighed the risk of harm or even death to a U.S. Border Patrol agent or similarly-situated law enforcement officer.

232.   The additional danger created by Defendant Gillett caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Gillett's actions described herein.

233.   Brian Terry's death was a foreseeable consequence of Defendant Gillett's affirmative actions described herein.

234.   Defendant Gillett was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but Defendant Gillett was recklessly indifferent to the consequences of the danger he had created.

235.   Defendant Gillett was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant Gillett's actions.

236.   Defendant Gillett is not entitled to qualified immunity.

237.   As explained herein, Defendant Gillett violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

238.   Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant Gillett's actions in 2009 and 2010.

239.   By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

240.   No reasonable federal law enforcement officer in Defendant Gillett's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant Gillett's deliberately indifferent actions.

241.   Moreover, Defendant Gillett took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant Gillett's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

242.   Defendant Gillett's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

243.   The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

244.   Defendant Gillett's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

245.   Defendant Gillett's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Gillett, in an amount to be determined at trial.

## CLAIM FOUR
### Defendant George Gillett
(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

246.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

247.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant Gillett for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

248.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

249.   Defendant Gillett violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

38

250. The additional danger created by Defendant Gillett was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

251. The additional danger created by Defendant Gillett caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Gillett's actions.

252. Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant Gillett's affirmative actions described herein.

253. Defendant Gillett was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but was recklessly indifferent to the consequences of the danger he had created, as set forth herein.

254. Defendant Gillett is not entitled to qualified immunity.

255. As explained herein, Defendant Gillett violated Plaintiffs' constitutional liberty interest in a continuing relationship with their son by knowingly creating an additional danger to law enforcement officers like Brian Terry.

256. Plaintiffs had a constitutional right to be free from state-created danger that could cause the loss of their son, and this constitutional right was clearly established by the time of Defendants' actions in 2009 and 2010.

257. By 2009 it was clearly established beyond dispute that federal officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

258. No reasonable federal law enforcement officer in Defendant Gillett's position could have concluded that Plaintiffs had no constitutional right for their son not to be placed in physical danger by Defendant Gillett's deliberately indifferent actions.

259.   Defendant Gillett's actions proximately and actually caused the death of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their constitutionally-protected liberty interest in familial companionship.

260.   The amount of damages to compensate Plaintiffs for the harm caused by Defendant Gillett's actions depriving them of their constitutionally-protected liberty interest in familial companionship will be proved at trial.

261.   Defendant Gillett's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

262.   Defendant Gillett's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Gillett, in an amount to be determined at trial.

**CLAIM FIVE**
**Defendant David Voth**
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's
Constitutional Right to Be Free of Bodily Harm)

263.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

264.   This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant Voth for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

265.   The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

266.   Defendant Voth violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

267.   The additional danger created by Defendant Voth was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

268.   In addition to the conduct already described herein, Defendant Voth himself specifically created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Organizing, implementing, and supervising an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms;

- Refusing a December 8, 2009, request from ATF's Tucson office to take action to slow or stop the large amounts of illegal weapons purchases and transfers by Mexican drug cartel operatives;

- Despite knowing on or before December 10, 2009, that weapons bought by straw purchasers under investigation in Operation Fast and Furious were going immediately across the border to the Mexican drug cartels for use in violent crimes, and knowing that allowing these purchases and transfers to continue was wrongful, continuing in the rest of December 2009 and through 2010 to order ATF agents not to intercept the weapons or even approach the straw purchasers;

- On December 17, 2009, with Defendant MacAllister and Defendant Hurley, meeting with Defendant Lone Wolf and instructing Defendant Lone Wolf to make illegal sales of firearms to known straw purchasers because the ATF Defendants and Defendant Hurley were tracking and ultimately interdicting the weapons and later arresting the straw purchasers;

- Drafting a January 5, 2010, briefing paper on Operation Fast and Furious which expressly stated that the current strategy was "to allow the transfer of firearms";

- Threatening to fire or discipline Group VII agents who disagreed with Operation Fast and Furious' gunwalking tactics or who wanted to arrest straw purchasers and interdict illegally-purchased weapons;

- In April, May, and August 2010 instructing one or more other FFLs that they should continue to make illegal firearms sales because ATF was surveilling and tracking all straw purchasers and illegally-purchased weapons, falsely claiming that the FFLs' cooperation was leading to arrests;

- In August 2010 misrepresenting to an ATF supervisor in a different office that Phoenix ATF had seized "hundreds" of illegally-purchased weapons; and

- Aggravating Plaintiffs' harm by engaging in a cover-up of Operation Fast and Furious following the death of Brian Terry, including but not limited to implementing a plan to arrest Avila immediately following the Brian Terry murder for unrelated crimes to hide the link between Avila, Operation Fast and Furious, and the murder and implementing a gag order on discussion of Operation Fast and Furious outside of Group VII.

269. Upon information and belief, Defendant Voth acknowledged his awareness of the risk to law enforcement officers working in the Mexico-U.S. border region created by his actions, indicating in conversations with Group VII agents that he believed that the benefits of the Operation Fast and Furious investigation outweighed the risk of harm or even death to a U.S. Border Patrol agent or similarly-situated law enforcement officer.

270. The additional danger created by Defendant Voth caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Voth's actions described herein.

42

271.   Brian Terry's death was a foreseeable consequence of Defendant Voth's affirmative actions described herein.

272.   Defendant Voth was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but Defendant Voth was recklessly indifferent to the consequences of the danger he had created.

273.   Defendant Voth was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant Voth's actions.

274.   Defendant Voth is not entitled to qualified immunity.

275.   As explained herein, Defendant Voth violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

276.   Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant Voth's actions in 2009 and 2010.

277.   By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

278.   No reasonable federal law enforcement officer in Defendant Voth's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant Voth's deliberately indifferent actions.

279.   Moreover, Defendant Voth took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant Voth's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

43

280.   Defendant Voth's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

281.   The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

282.   Defendant Voth's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

283.   Defendant Voth's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Voth, in an amount to be determined at trial.

## CLAIM SIX
### Defendant David Voth
(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

284.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

285.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant Voth for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

286.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

287.   Defendant Voth violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

288.   The additional danger created by Defendant Voth was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

289.   The additional danger created by Defendant Voth caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Voth's actions.

290.   Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant Voth's affirmative actions described herein.

291.   Defendant Voth was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but was recklessly indifferent to the consequences of the danger he had created, as set forth herein.

292.   Defendant Voth is not entitled to qualified immunity.

293.   As explained herein, Defendant Voth violated Plaintiffs' constitutional liberty interest in a continuing relationship with their son by knowingly creating an additional danger to law enforcement officers like Brian Terry.

294.   Plaintiffs had a constitutional right to be free from state-created danger that could cause the loss of their son, and this constitutional right was clearly established by the time of Defendants' actions in 2009 and 2010.

295.   By 2009 it was clearly established beyond dispute that federal officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

296.   No reasonable federal law enforcement officer in Defendant Voth's position could have concluded that Plaintiffs had no constitutional right for their son not to be placed in physical danger by Defendant Voth's deliberately indifferent actions.

297.   Defendant Voth's actions proximately and actually caused the death of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their constitutionally-protected liberty interest in familial companionship.

298.   The amount of damages to compensate Plaintiffs for the harm caused by Defendant Voth's actions depriving them of their constitutionally-protected liberty interest in familial companionship will be proved at trial.

299.   Defendant Voth's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

300.   Defendant Voth's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Voth, in an amount to be determined at trial.

## CLAIM SEVEN
### Defendant Hope MacAllister
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's Constitutional Right to Be Free of Bodily Harm)

301.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

302.   This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant MacAllister for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

303.   The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

1      304.    Defendant MacAllister violated Brian Terry's constitutionally-protected

2 liberty interest in bodily security by knowingly creating an additional danger to law

3 enforcement officers like Brian Terry.

4      305.    The additional danger created by Defendant MacAllister was particularly

5 acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian

6 Terry.

7      306.    In addition to the conduct already described herein, Defendant MacAllister

8 herself specifically created an additional danger to law enforcement officers like Brian

9 Terry, through, *inter alia*, the following affirmative acts:

10      •    Organizing, implementing, and supervising an ATF operation built around

11          a tactic of facilitating the arming of violent criminals with military-grade

12          firearms;

13      •    Putting a "hold" in the Suspect Gun Database on releasing further

14          information regarding weapons illegally purchased by the Operation Fast

15          and Furious suspects so that other law enforcement officials could not

16          contact or arrest those suspects or otherwise interfere with Operation Fast

17          and Furious;

18      •    Despite knowing on or before December 10, 2009, that weapons bought by

19          straw purchasers under investigation in Operation Fast and Furious were

20          going immediately across the border to the Mexican drug cartels for use in

21          violent crimes, and knowing that allowing these purchases and transfers to

22          continue was wrongful, and despite often knowing from FFLs in advance

23          that straw purchases were going to occur, continuing in the rest of

24          December 2009 and through 2010 to order ATF agents not to intercept the

25          weapons or even approach the straw purchasers;

26      •    On December 17, 2009, with Defendant Voth and Defendant Hurley,

27          meeting with Defendant Lone Wolf and instructing Defendant Lone Wolf

28          to make illegal sales of firearms to known straw purchasers because the

1        ATF Defendants and Defendant Hurley were tracking and ultimately

2        interdicting the weapons and later arresting the straw purchasers;

3     • Participating in a January 5, 2010, Operation Fast and Furious group

4        meeting leading to the memorializing of that discussion in a briefing paper

5        which expressly approved the strategy of allowing the transfer of weapons;

6     • In March 2010 improperly denying approval of a request to arrest a

7        ringleader in the firearms trafficking conspiracy, Uriel Patino, because –

8        despite surveillance of Patino illegally purchasing and transferring three .50

9        caliber rifles and making dozens of other suspicious purchases – Defendant

10       MacAllister claimed that there was no probable cause to arrest Patino;

11    • On May 29, 2010, meeting with the suspected leader of the firearms

12       trafficking conspiracy and primary investigative target of Operation Fast

13       and Furious, Manuel Celis-Acosta, after Celis-Acosta was detained at the

14       United States-Mexico border but then, rather than arresting Celis-Acosta,

15       allowing him to leave to enter Mexico in the vain hope that he would later

16       serve as an informant against Mexican drug cartel leaders;

17    • In July 2010, telling an FFL to sell a .50 cal weapon to a known straw

18       purchaser but to sabotage the weapon before making the illegal sale;

19    • Hiding from other law enforcement authorities the knowledge that weapons

20       recovered at the scene of murder of Mario Gonzalez Rodriguez by drug

21       cartel operatives in November 2010 were traced to Operation Fast and

22       Furious straw purchasers; and

23    • Aggravating Plaintiffs' harm by engaging in a cover-up of Operation Fast

24       and Furious following the death of Brian Terry, including but not limited to

25       implementing a plan to arrest Avila immediately following the Brian Terry

26       murder for unrelated crimes to hide the link between Avila, Operation Fast

27       and Furious, and the murder and implementing a gag order on discussion of

28       Operation Fast and Furious outside of Group VII.

307.   Upon information and belief, Defendant MacAllister acknowledged her awareness of the risk to law enforcement officers working in the Mexico-U.S. border region created by her actions, indicating in conversations with Group VII agents that she believed that the benefits of the Operation Fast and Furious investigation outweighed the risk of harm or even death to a U.S. Border Patrol agent or similarly-situated law enforcement officer.

308.   The additional danger created by Defendant MacAllister caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant MacAllister's actions described herein.

309.   Brian Terry's death was a foreseeable consequence of Defendant MacAllister's affirmative actions described herein.

310.   Defendant MacAllister was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but Defendant MacAllister was recklessly indifferent to the consequences of the danger she had created.

311.   Defendant MacAllister was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant MacAllister's actions.

312.   Defendant MacAllister is not entitled to qualified immunity.

313.   As explained herein, Defendant MacAllister violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

314.   Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant MacAllister's actions in 2009 and 2010.

315.   By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

316.   No reasonable federal law enforcement officer in Defendant MacAllister's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant MacAllister's deliberately indifferent actions.

317.   Moreover, Defendant MacAllister took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant MacAllister's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

318.   Defendant MacAllister's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

319.   The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

320.   Defendant MacAllister's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

321.   Defendant MacAllister's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant MacAllister, in an amount to be determined at trial.

## CLAIM EIGHT
### Defendant Hope MacAllister
(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

322.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

323.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant MacAllister

for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

324.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

325.   Defendant MacAllister violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

326.   The additional danger created by Defendant MacAllister was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

327.   The additional danger created by Defendant MacAllister caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant MacAllister's actions.

328.   Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant MacAllister's affirmative actions described herein.

329.   Defendant MacAllister was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of her actions, but was recklessly indifferent to the consequences of the danger she had created, as set forth herein.

330.   Defendant MacAllister is not entitled to qualified immunity.

331.   As explained herein, Defendant MacAllister violated Plaintiffs' constitutional liberty interest in a continuing relationship with their son by knowingly creating an additional danger to law enforcement officers like Brian Terry.

332.   Plaintiffs had a constitutional right to be free from state-created danger that could cause the loss of their son, and this constitutional right was clearly established by the time of Defendants' actions in 2009 and 2010.

333.   By 2009 it was clearly established beyond dispute that federal officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

334.   No reasonable federal law enforcement officer in Defendant MacAllister's position could have concluded that Plaintiffs had no constitutional right for their son not to be placed in physical danger by Defendant MacAllister's deliberately indifferent actions.

335.   Defendant MacAllister's actions proximately and actually caused the death of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their constitutionally-protected liberty interest in familial companionship.

336.   The amount of damages to compensate Plaintiffs for the harm caused by Defendant MacAllister's actions depriving them of their constitutionally-protected liberty interest in familial companionship will be proved at trial.

337.   Defendant MacAllister's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

338.   Defendant MacAllister's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant MacAllister, in an amount to be determined at trial.

### CLAIM NINE
### Defendant Tonya English
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's
Constitutional Right to Be Free of Bodily Harm)

339.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

340.   This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant English for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

341.   The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

342.   Defendant English violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

343.   The additional danger created by Defendant English was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

344.   In addition to the conduct already described herein, Defendant English herself specifically created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Organizing, implementing, and supervising an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms;

- Despite knowing, upon information and belief, by December 2009, that weapons bought by straw purchasers under investigation in Operation Fast and Furious were going immediately across the border to the Mexican drug cartels for use in violent crimes, and knowing that allowing these purchases and transfers to continue was wrongful, and despite often knowing from FFLs in advance that straw purchases were going to occur, continuing in the rest of December 2009 and through 2010 to order ATF agents not to intercept the weapons or even approach the straw purchasers; and

- Deciding to hide from other law enforcement authorities the knowledge that weapons recovered at the scene of murder of Mario Gonzalez Rodriguez by drug cartel operatives in November 2010 were traced to Operation Fast and Furious straw purchasers.

345. Upon information and belief, Defendant English acknowledged her awareness of the risk to law enforcement officers working in the Mexico-U.S. border region created by her actions, indicating in conversations with Group VII agents that she believed that the benefits of the Operation Fast and Furious investigation outweighed the risk of harm or even death to a U.S. Border Patrol agent or similarly-situated law enforcement officer.

346. The additional danger created by Defendant English caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant English's actions described herein.

347. Brian Terry's death was a foreseeable consequence of Defendant English's affirmative actions described herein.

348. Defendant English was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of her actions, but Defendant English was recklessly indifferent to the consequences of the danger she had created.

349. Defendant English was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant English's actions.

350. Defendant English is not entitled to qualified immunity.

351. As explained herein, Defendant English violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

352.   Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant English's actions in 2009 and 2010.

353.   By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

354.   No reasonable federal law enforcement officer in Defendant English's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant English's deliberately indifferent actions.

355.   Moreover, Defendant English took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant English's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

356.   Defendant English's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

357.   The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

358.   Defendant English's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

359.   Defendant English's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant English, in an amount to be determined at trial.

## CLAIM TEN
### Defendant Tonya English
(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

360.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

361.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant English for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

362.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

363.   Defendant English violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

364.   The additional danger created by Defendant English was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

365.   The additional danger created by Defendant English caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant English's actions.

366.   Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant English's affirmative actions described herein.

367.   Defendant English was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of her actions, but was

1  recklessly indifferent to the consequences of the danger she had created, as set forth

2  herein.

3      368.   Defendant English is not entitled to qualified immunity.

4      369.   As explained herein, Defendant English violated Plaintiffs' constitutional

5  liberty interest in a continuing relationship with their son by knowingly creating an

6  additional danger to law enforcement officers like Brian Terry.

7      370.   Plaintiffs had a constitutional right to be free from state-created danger that

8  could cause the loss of their son, and this constitutional right was clearly established by

9  the time of Defendants' actions in 2009 and 2010.

10     371.   By 2009 it was clearly established beyond dispute that federal officials

11  could be held liable where they affirmatively and with deliberate indifference placed an

12  individual in danger he would not otherwise have faced.

13     372.   No reasonable federal law enforcement officer in Defendant English's

14  position could have concluded that Plaintiffs had no constitutional right for their son not

15  to be placed in physical danger by Defendant English's deliberately indifferent actions.

16     373.   Defendant English's actions proximately and actually caused the death of

17  Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their

18  constitutionally-protected liberty interest in familial companionship.

19     374.   The amount of damages to compensate Plaintiffs for the harm caused by

20  Defendant English's actions depriving them of their constitutionally-protected liberty

21  interest in familial companionship will be proved at trial.

22     375.   Defendant English's gross misconduct as described herein was willful,

23  wanton, and undertaken with reckless or conscious disregard for the substantial

24  probability that those acts and omissions could create a substantial risk of significant

25  harm to others, including law enforcement officers like Brian Terry.

26     376.   Defendant English's gross misconduct as described herein entitles Plaintiffs

27  to an award of punitive damages against Defendant English, in an amount to be

28  determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIM ELEVEN
### Defendant William McMahon
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's
Constitutional Right to Be Free of Bodily Harm)

377.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

378.   This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant McMahon for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

379.   The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

380.   Defendant McMahon violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

381.   The additional danger created by Defendant McMahon was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

382.   In addition to the conduct already described herein, Defendant McMahon himself personally created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Approving an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms, where Defendant McMahon's disapproval would have at any time scuttled the operation and ended the use of gunwalking tactics;

- Approving the decision in Operation Fast and Furious to eschew proper law enforcement strategies to arrest straw purchasers and intercepting illegally-

purchased weapons in order to solely focus on obtaining a T-III federal wiretap because obtaining such a wiretap under his supervision would better promote Defendant McMahon's professional and political career;

- Actively ignoring information in the T-III federal wiretap applications that Defendant McMahon had an express legal duty to review and approve that directly demonstrated gunwalking tactics were being used and inherently creating a danger to other law enforcement and the public;

- Hiding his knowledge of the improper gunwalking tactics in Operation Fast and Furious from other ATF and law enforcement authorities; and

- Despite knowing by November 2009 that weapons bought by straw purchasers under investigation in Operation Fast and Furious were going immediately across the border to the Mexican drug cartels for use in violent crimes, and knowing that allowing these purchases and transfers to continue was wrongful, continuing in November 2009, December 2009, and through 2010 to approve the strategic decision not to intercept the weapons or even approach the straw purchasers.

383.    The additional danger created by Defendant McMahon caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant McMahon's actions described herein.

384.    Brian Terry's death was a foreseeable consequence of Defendant McMahon's affirmative actions described herein.

385.    Defendant McMahon was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but Defendant McMahon was recklessly indifferent to the consequences of the danger he had created.

386.    Defendant McMahon was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border

Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant McMahon's actions.

387.    Defendant McMahon is not entitled to qualified immunity.

388.    As explained herein, Defendant McMahon violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

389.    Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant McMahon's actions in 2009 and 2010.

390.    By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

391.    No reasonable ATF agent or administrator in Defendant McMahon's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant McMahon's deliberately indifferent actions.

392.    Moreover, Defendant McMahon took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant McMahon's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

393.    Defendant McMahon's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

394.    The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

395.    Defendant McMahon's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial

1   probability that those acts and omissions could create a substantial risk of significant

2   harm to others, including law enforcement officers like Brian Terry.

3       396.   Defendant McMahon's gross misconduct as described herein entitles

4   Plaintiffs to an award of punitive damages against Defendant McMahon, in an amount to

5   be determined at trial.

6   **CLAIM TWELVE**
**Defendant William McMahon**

7   (*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine

8   Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

9       397.   Plaintiffs incorporate by reference all preceding allegations as though fully

10  set forth herein.

11      398.   This cause of action is brought by Plaintiffs, in their individual and

12  personal capacities as the natural parents of Brian Terry, against Defendant McMahon for

13  deprivation of Plaintiffs' constitutional right to a continuing relationship with their son

14  under the Due Process Clause of the Fifth Amendment and Free Association Clause of

15  the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown*

16  *Federal Narcotics Agents,* 403 U.S. 388 (1971).

17      399.   The Constitution, specifically the First and Fifth Amendments, protects

18  citizens' liberty interest in familial companionship from violation by federal government

19  action.

20      400.   Defendant McMahon violated Plaintiffs' liberty interest in familial

21  companionship by knowingly creating an additional danger to law enforcement officers

22  like Brian Terry, as described herein.

23      401.   The additional danger created by Defendant McMahon was particularly

24  acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian

25  Terry.

26      402.   The additional danger created by Defendant McMahon caused Brian

27  Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian

28

1  Terry was murdered by Mexican drug cartel operatives using weapons obtained because
2  of Defendant McMahon's actions.

3      403.   Brian Terry's death and the corresponding violation of Plaintiffs'
4  constitutional right to a continuing relationship with their son were foreseeable
5  consequences of Defendant McMahon's affirmative actions described herein.

6      404.   Defendant McMahon was well aware that the murder of an American law
7  enforcement agent was very likely to occur as a consequence of his actions, but was
8  recklessly indifferent to the consequences of the danger he had created, as set forth
9  herein.

10     405.   Defendant McMahon is not entitled to qualified immunity.

11     406.   As explained herein, Defendant McMahon violated Plaintiffs'
12  constitutional liberty interest in a continuing relationship with their son by knowingly
13  creating an additional danger to law enforcement officers like Brian Terry.

14     407.   Plaintiffs had a constitutional right to be free from state-created danger that
15  could cause the loss of their son, and this constitutional right was clearly established by
16  the time of Defendants' actions in 2009 and 2010.

17     408.   By 2009 it was clearly established beyond dispute that federal officials
18  could be held liable where they affirmatively and with deliberate indifference placed an
19  individual in danger he would not otherwise have faced.

20     409.   No reasonable ATF agent or administrator in Defendant McMahon's
21  position could have concluded that Plaintiffs had no constitutional right for their son not
22  to be placed in physical danger by Defendant McMahon's deliberately indifferent actions.

23     410.   Defendant McMahon's actions proximately and actually caused the death
24  of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their
25  constitutionally-protected liberty interest in familial companionship.

26     411.   The amount of damages to compensate Plaintiffs for the harm caused by
27  Defendant McMahon's actions depriving them of their constitutionally-protected liberty
28  interest in familial companionship will be proved at trial.

412.    Defendant McMahon's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

413.    Defendant McMahon's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant McMahon, in an amount to be determined at trial.

## CLAIM THIRTEEN
### Defendant Emory Hurley
(*Bivens* Substantive Due Process Claim for Violation of Brian Terry's Constitutional Right to Be Free of Bodily Harm)

414.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

415.    This cause of action is brought by Plaintiffs, as co-Personal Representatives of Brian A. Terry's decedent estate, against Defendant Hurley for deprivation of Brian Terry's constitutional right to be free of bodily harm under the Due Process Clause of the Fifth Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

416.    The Constitution, specifically the Due Process Clause of the Fifth Amendment, protects citizens' liberty interest in their own bodily security from violation by federal government action.

417.    Defendant Hurley violated Brian Terry's constitutionally-protected liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

418.    The additional danger created by Defendant Hurley was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

419.    In addition to the conduct already described herein, Defendant Hurley himself personally created an additional danger to law enforcement officers like Brian Terry, through, *inter alia*, the following affirmative acts:

- Approving an ATF operation built around a tactic of facilitating the arming of violent criminals with military-grade firearms, where, as lead prosecutor, Defendant Hurley's disapproval as lead prosecutor would have at any time scuttled the operation and ended the use of gunwalking tactics;

- Despite knowing by November 2009 that weapons bought by straw purchasers under investigation in Operation Fast and Furious were going immediately across the border to the Mexican drug cartels for use in violent crimes, and knowing that allowing these purchases and transfers to continue was wrongful, continuing in November 2009, December 2009, and through 2010 to approve the strategic decision not to intercept the weapons or even approach the straw purchasers;

- On December 17, 2009, with Defendant Voth and Defendant MacAllister, meeting with Defendant Lone Wolf and instructing Defendant Lone Wolf to make illegal sales of firearms to known straw purchasers because the ATF Defendants and Defendant Hurley were tracking and ultimately interdicting the weapons and later arresting the straw purchasers;

- Participating in a January 5, 2010, Operation Fast and Furious group meeting leading to the memorializing of that discussion in a briefing paper which expressly approved the strategy of allowing the transfer of weapons;

- In March 2010 improperly denying approval of a request to arrest a ringleader in the firearms trafficking conspiracy, Uriel Patino, because – despite surveillance of Patino illegally purchasing and transferring three .50 caliber rifles and making dozens of other suspicious purchases – Defendant Hurley claimed that there was no probable cause to arrest Patino;

- In May 2010 meeting, with Defendant Voth, an FFL and instructing the FFL that it should continue to make illegal firearms sales because ATF was surveilling and tracking all straw purchasers and illegally-purchased weapons and that the FFL's cooperation was leading to arrests;

- Later calling that FFL and again reassuring the FFL that continuing to make illegal sales was the "right thing to do" and that this "cooperation" from the FFL was leading to arrests;

- In July 2010, telling to Defendant MacAllister to direct an FFL to make an illegal sale but to have the FFL sabotage the weapon first; and

- In October 2010, drafting a briefing paper that falsely claimed that Operation Fast and Furious did not involve gunwalking, that ATF had been "very aggressive" in seizing weapons, and that while the case was moving towards indictment agents were continuing to seize weapons.

420.   Upon information and belief, in internal emails to other ATF and DOJ personnel, including the ATF Defendants, Defendant Hurley acknowledged the recklessness of the gunwalking tactics in Operation Fast and Furious.

421.   The additional danger created by Defendant Hurley caused Brian Terry's death when he was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Hurley's actions described herein.

422.   Brian Terry's death was a foreseeable consequence of Defendant Hurley's affirmative actions described herein.

423.   Defendant Hurley was aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but Defendant Hurley was recklessly indifferent to the consequences of the danger he had created.

424.   Defendant Hurley was further aware that federal law enforcement agents working in and around the United States-Mexico border area, like U.S. Border Patrol agent Brian Terry, were particularly likely to suffer physical harm or death as a result of Operation Fast and Furious and Defendant Hurley's actions.

425.   Defendant Hurley is not entitled to qualified immunity.

426.    As explained herein, Defendant Hurley violated Brian Terry's constitutional liberty interest in bodily security by knowingly creating an additional danger to law enforcement officers like Brian Terry.

427.    Brian Terry's constitutional right to be free from state-created danger was clearly established by the time of Defendant Hurley's actions in 2009 and 2010.

428.    By 2009 it was clearly established beyond dispute that federal officials could be held liable for constitutional violations where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

429.    No reasonable federal prosecutor in Defendant Hurley's position could have concluded that Brian Terry had no constitutional right not to be placed in physical danger by Defendant Hurley's deliberately indifferent actions.

430.    Moreover, Defendant Hurley took no action to warn Brian Terry and similarly-situated law enforcement officers of the danger Defendant Hurley's actions created even after other acts of criminal violence using the illegally-purchased firearms against other American law enforcement agents occurred, so Brian Terry and similarly-situated law enforcement officers working near the United States-Mexico border had no opportunity to take protective measures to address or avoid the danger.

431.    Defendant Hurley's actions depriving Brian Terry of his constitutionally-protected liberty interest in bodily integrity proximately and actually caused him harm.

432.    The amount of damages to compensate Brian Terry's decedent estate for the harm caused by Defendants' actions will be proved at trial.

433.    Defendant Hurley's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

434.    Defendant Hurley's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Hurley, in an amount to be determined at trial.

## CLAIM FOURTEEN
### Defendant Emory Hurley
(*Bivens* Substantive Due Process Claim for Violation of Kent Terry's and Josephine Terry's Constitutional Right to a Continuing Relationship With Their Son, Brian Terry)

435.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

436.   This cause of action is brought by Plaintiffs, in their individual and personal capacities as the natural parents of Brian Terry, against Defendant Hurley for deprivation of Plaintiffs' constitutional right to a continuing relationship with their son under the Due Process Clause of the Fifth Amendment and Free Association Clause of the First Amendment to the United States Constitution pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971).

437.   The Constitution, specifically the First and Fifth Amendments, protects citizens' liberty interest in familial companionship from violation by federal government action.

438.   Defendant Hurley violated Plaintiffs' liberty interest in familial companionship by knowingly creating an additional danger to law enforcement officers like Brian Terry, as described herein.

439.   The additional danger created by Defendant Hurley was particularly acute to law enforcement officers patrolling the U.S.-Mexico border area, like Brian Terry.

440.   The additional danger created by Defendant Hurley caused Brian Terry's death, and destroyed Plaintiffs' familial relationship with their son, when Brian Terry was murdered by Mexican drug cartel operatives using weapons obtained because of Defendant Hurley's actions.

441.   Brian Terry's death and the corresponding violation of Plaintiffs' constitutional right to a continuing relationship with their son were foreseeable consequences of Defendant Hurley's affirmative actions described herein.

442.   Defendant Hurley was well aware that the murder of an American law enforcement agent was very likely to occur as a consequence of his actions, but was

67

recklessly indifferent to the consequences of the danger he had created, as set forth herein.

443.   Defendant Hurley is not entitled to qualified immunity.

444.   As explained herein, Defendant Hurley violated Plaintiffs' constitutional liberty interest in a continuing relationship with their son by knowingly creating an additional danger to law enforcement officers like Brian Terry.

445.   Plaintiffs had a constitutional right to be free from state-created danger that could cause the loss of their son, and this constitutional right was clearly established by the time of Defendants' actions in 2009 and 2010.

446.   By 2009 it was clearly established beyond dispute that federal officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger he would not otherwise have faced.

447.   No reasonable federal prosecutor in Defendant Hurley's position could have concluded that Plaintiffs had no constitutional right for their son not to be placed in physical danger by Defendant Hurley's deliberately indifferent actions.

448.   Defendant Hurley's actions proximately and actually caused the death of Brian Terry and Plaintiffs' corresponding harm by depriving Plaintiffs of their constitutionally-protected liberty interest in familial companionship.

449.   The amount of damages to compensate Plaintiffs for the harm caused by Defendant Hurley's actions depriving them of their constitutionally-protected liberty interest in familial companionship will be proved at trial.

450.   Defendant Hurley's gross misconduct as described herein was willful, wanton, and undertaken with reckless or conscious disregard for the substantial probability that those acts and omissions could create a substantial risk of significant harm to others, including law enforcement officers like Brian Terry.

451.   Defendant Hurley's gross misconduct as described herein entitles Plaintiffs to an award of punitive damages against Defendant Hurley, in an amount to be determined at trial.

1

**CLAIM FIFTEEN**
**Defendants Lone Wolf**
(Negligence; Wrongful Death)

452.   Plaintiffs incorporate by reference all previous allegations in this complaint.

453.   Defendants Lone Wolf owed Brian Terry and all members of the general public a duty not to create a risk of harm.

454.   Defendants Lone Wolf breached this duty by, *inter alia*, making sales of dangerous firearms to Avila and other parties that the Lone Wolf Defendants knew or should have known were straw purchasers for Mexican drug cartels, including the sale of two AK-47 style assault rifles to Avila on January 16, 2010.

455.   Defendants Lone Wolf knew or should have known that Avila and other straw purchasers were not buying firearms for their own personal use but rather were being paid by the Mexican drug cartels to make the firearms purchases and convey the weapons to the cartels, and Defendants Lone Wolf knew or should have known that once the weapons were conveyed to the cartels by Avila they were very likely to be used to commit acts of violence against others, particularly law enforcement agents like Brian Terry.

456.   Defendants Lone Wolf knew or should have known that the sales of dangerous firearms to Avila and other straw purchasers for the cartels constituted violations of federal and Arizona law.

457.   In December 2009, Defendants Lone Wolf had discussions with ATF about the illegal straw purchases.

458.   Whatever the substance of those discussions, Defendants Lone Wolf knew that ATF subsequently did nothing to arrest the purchasers or otherwise stop the purchases since the same straw buyers continued to make illegal firearms buys.

459.   Defendants Lone Wolf could not reasonably rely on any ATF representations that ATF was tracking or surveilling the illegal firearms purchasers or the illegally purchased firearms to make the sales because Defendants Lone Wolf had

1  statutory and common law duties not to make illegal sales of firearms, especially illegal

2  sales of firearms to violent criminals.

3       460.   Defendants Lone Wolf proceeded with violating their statutory and

4  common law duties not to make illegal firearms sales because Defendants Lone Wolf

5  realized substantial profits from the sales.

6       461.   As a direct and proximate cause of the breaches of Defendants Lone Wolf's

7  duties of care, Brian Terry was murdered.

8       462.   As a direct and proximate cause of the breaches of Defendants Lone Wolf's

9  duties of care, Plaintiffs sustained substantial and permanent injuries as a direct and

10  proximate result of the wrongful death of their son.

11       463.   Plaintiffs' injuries include, *inter alia*, loss of love, income, affection,

12  companionship, care, protection, and guidance and experiencing disability, pain, anguish,

13  sorrow, mental suffering, stress, and shock.

14       464.   The amount of Plaintiffs' damages will be proved at trial.

15                              **CLAIM SIXTEEN**
16                          **Defendants Lone Wolf**
                            (Negligence *Per Se*)

17       465.   Plaintiffs incorporate by reference all previous allegations in this complaint.

18       466.   By selling weapons to Avila and other straw purchasers, Defendants Lone

19  Wolf violated numerous federal and state statutes and regulations including, *inter alia*,

20  provisions of the Gun Control Act, 18 U.S.C. §§ 921, *et seq.*, and A.R.S. Title 13,

21  Chapter 31, §§ 33-3101, *et seq.*  These statutes, other firearms trafficking laws and

22  regulations, and other criminal and public safety laws and regulations violated by

23  Defendants Lone Wolf are designed to protect the safety of the general public from the

24  substantial risk of serious harm posed by illegal firearms trafficking.

25       467.   Defendants Lone Wolf's violation of these statutes and other federal and

26  state criminal statutes constitutes negligence *per se*.

27       468.   Any purported reliance by Defendants Lone Wolf on ATF representations

28  that ATF was tracking or surveilling the illegal firearms purchasers or the illegally

purchased firearms was unreasonable and does not excuse Defendants Lone Wolf's violations of the public safety statutes referenced above or from being found negligent *per se.*

469.   Defendants Lone Wolf proceeded with violating the above public safety statutes because Defendants Lone Wolf reaped substantial pecuniary rewards from the illegal firearms sales.

470.   As a direct and proximate result of Defendants Lone Wolf's negligence *per se*, Brian Terry was murdered.

471.   As a direct and proximate result of Defendants Lone Wolf's negligence *per se*, Plaintiffs suffered damages as described above.

## JURY TRIAL DEMAND

472.   Plaintiffs request a trial by jury in this matter.

## PRAYER

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

A.   For general damages to compensate Plaintiffs for the loss of love, income, affection, companionship, care, protection, and guidance of their son, Brian Terry, and for the disability, pain, anguish, sorrow, mental suffering, stress, and shock that they have experienced, and will continue to experience in the future;

B.   For the reasonable value of medical, funeral, and burial expenses incurred for services rendered for Brian Terry;

C.   For the value of Brian Terry's pain and suffering before death;

D.   For the loss of Brian Terry's enjoyment of life , including the value of his lost future wages and salary;

E.   For other general and special damages available under law;

D.   For punitive damages against the ATF Defendants and Defendant Hurley as appropriate under applicable law;

E.   For Plaintiffs' cost of suit; and

F.      For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 13th day of December, 2012.

GALLAGHER & KENNEDY, P.A.

By _____ /s/ *Lincoln Combs* _____
        Patrick J. McGroder III
        Lincoln Combs
        2575 East Camelback Road
        Phoenix, Arizona 85016-9225
        Attorneys for Plaintiffs Kent Terry
        and Josephine Terry

23330-0001/3007949

72